# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER LAMONT BRADSHAW,<br><br>Defendant. | 3:17-CR-30101(02)-RAL<br><br>REPORT AND<br>RECOMMENDATION FOR<br>DISPOSITON OF MOTION TO<br>SUPPRESS |

Armed with a search warrant, tribal law enforcement officers seized drugs and contraband from property located on a rural homesite and its curtilage. Christopher Lamont Bradshaw claims that he was unlawfully stopped and detained at the site and that the warrant issued to search it was deficient and tainted certain evidence the Government intends to use against him. He seeks to suppress this evidence on Fourth Amendment grounds. Because the stop, detention, searches and seizures were constitutionally permissible and do not require exclusion of the contested evidence, the Court recommends that Bradshaw's suppression motion be denied.

## BACKGROUND

During the evening of April 25, 2017, Officers Joshua Antman and Gerald Dillon, along with Special Agent Benjamin Estes – all drug task force officers for the Rosebud Sioux Tribe – interviewed a confidential informant (CI) who stated that Antonio

Valentino Foster had been selling methamphetamine on the Rosebud Reservation for the last month. In the interviews, the CI disclosed that an individual by the name of Chris (whose last name was unknown) had been driving Foster around in a red four-door Volkswagen with tinted windows and no front license plate. According to the CI, Foster fronted the CI 9 grams of methamphetamine for $600 within the last day or two and 19 grams over the past month, which the CI had distributed to pay Foster for the drugs he advanced. The CI also revealed that Foster had sold an ounce of methamphetamine to Mike Gunhammer for $1,200 two weeks earlier.

That same night, shortly after the interviews, Agent Estes and Officer Antman administered a controlled buy of methamphetamine from Foster using the CI. The CI was supposed to purchase seven grams of methamphetamine from Foster for $600. Before the buy, Antman searched the CI and found $450 in cash on the CI's person. When asked, the CI said that the money was what he had collected to pay Foster for the earlier nine-gram front. Antman took and stored the money separately so that it would not be commingled with the funds used in the buy.

The CI drove to the controlled buy location while Agent Estes and Officer Antman watched from, and then passed by in, Antman's truck. After the purchase took place, the CI reported that Foster got out of a red Volkswagen Chris had pulled up in and sat in the CI's vehicle. There, Foster gave the CI two baggies of a white crystal substance in exchange for $600. Before departing, Foster remarked that he had more

methamphetamine to sell. The baggies field tested positive for methamphetamine and weighed approximately 13.5 grams.

At 6:43 p.m., the next night (April 26, 2017), Officers Dillon and Antman drove to Michael Millard's residence, outside Mission. They believed, given the information they had received, that this was where Foster and Chris were staying. The officers observed a red four-door tinted windowed Volkswagen car, without a front license plate, parked in the driveway of the home. Antman drove by the residence about four and-a-half hours later (at 11:08 p.m.) and noticed that the red Volkswagen was still there. At 3:40 the next morning, Dillon and Antman went to the home and saw the Volkswagen parked in the same spot.

Later in the morning (on April 27, 2017), Officer Antman requested a search warrant for the residence, surrounding curtilage, and vehicles located on the premises, including any vehicles belonging to Foster. A tribal judge granted the request and issued the warrant.

Officers arrived at the residence to serve the search warrant shortly after noon on April 27. The red Volkswagen was present, but it began to pull out of the driveway toward the road. Chris was the driver and Foster the passenger. Seeing that the Volkswagen was on the move, Officer Antman drove into the driveway and blocked the Volkswagen from leaving.

In response, the Volkswagen jolted in reverse, taking out a section of wire fence, before it swerved around to the corner of the fence line, became entangled in the fence

3

and other items and came to a halt. Chris and Foster jumped out of the vehicle and took off running into a nearby open field. Foster though quickly returned to the vehicle, grabbed something from it, and took off again. As he did so, Foster began tossing items into the field until he fell to the ground.

Ultimately, officers found $5,285 in cash and two cell phones on Foster's person. They also retrieved a soda can and black sock in the area where he had thrown items. The sock contained two baggies of a white substance, weighing 89.15 grams, that tested positive for methamphetamine. Several officers eventually apprehended and arrested Foster and Chris (later found to be Bradshaw) after chasing the two some distance.

At the scene, officers searched the red Volkswagen and seized from it another $97 in cash, two laptops, and a cell phone, as well as receipts and business papers with Bradshaw's name and address on them. Inside the Millard home, officers located and took possession of drug paraphernalia which, after being tested, had methamphetamine residue on it.

The Rosebud Tribe charged Millard with one or more drug tribal offenses. He moved to suppress the evidence seized from his house. A tribal judge granted the motion, finding that the tribal search warrant lacked the probable cause necessary to search the home. Neither Bradshaw nor Foster were parties to that case and the judge's order did not address either of them.

Meanwhile, a federal grand jury indicted Bradshaw and Foster for conspiracy to distribute 50 grams or more of methamphetamine, distribution of methamphetamine on

April 25, and possession with intent to distribute 50 grams or more of methamphetamine on April 27. Foster pled guilty to the methamphetamine conspiracy charge and has since been sentenced. Bradshaw though moved to suppress from use at trial all evidence seized during the execution of the tribal search warrant. At a hearing held to address Bradshaw's motion, the Government called three witnesses and offered 22 exhibits into evidence, all of which were received.

## DISCUSSION

### A. Stop and Detention

At the outset, Bradshaw takes issue with his stop and detention. He maintains that he was unlawfully blocked from leaving the driveway of Millard's residence, approached at gun point, and detained after a foot pursuit in an adjacent field.

An officer must have a reasonable basis to stop a motor vehicle. The critical question is: "[W]ould the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?"[1] In answering this question, a reviewing court "must look at the 'totality of the circumstances' of each case to see whether a detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[2]

---

[1] *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).

[2] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

Officer Antman and officers assisting him in the execution of the warrant had three valid reasons to stop and detain Bradshaw and Foster, who were trying to drive away in the red Volkswagen.

First, the search warrant authorized officers to search Millard's house and any vehicles within the curtilage of it or belonging to Foster. When Officer Antman arrived to execute the warrant, he saw the Volkswagen beginning to pull out of the driveway toward the road. The vehicle was still within the curtilage, where it could be searched. The vehicle might have belonged to Foster, in which case it could have been searched wherever found. Either way, Antman had reason to believe that the warrant authorized the search of the Volkswagen and it was reasonable for him to stop the vehicle to determine if it should be in the warrant search.[3]

Second, it was reasonable to prevent the Volkswagen from departing to find out whether any occupant of it was a resident of the Millard home. The warrant authorized searching the person of Foster as well as four other individuals. That gave Officer Antman reason to stop the Volkswagen and determine whether any of the five individuals were riding or hiding in the vehicle. The Supreme Court has recognized that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper

---

[3] *See United States v. Martinez-Cortes*, 566 F.3d 767, 770 (8th Cir. 2009).

search is conducted."[4]  The Court has held that it was constitutionally reasonable to detain a person descending the front steps while executing a warrant[5] and confirmed that the authority to detain forcibly during the execution process extends to all occupants of the premises, and not just the owner or subject of the warrant.[6]  Detaining occupants of a house, while it is being searched "prevent[s] flight in the event that incriminating evidence is found," and permits "the orderly completion of the search."[7]  Under the circumstances, Antman had the right to detain Foster and Bradshaw to determine whether they were occupants of the residence that he and executing officers were about to search.[8]

Third, impeding Bradshaw and Foster's ability to take off in the Volkswagen was justified by a strong interest in protecting Officer Antman's safety and other officers engaged in the inherently dangerous activity of executing a warrant to search for drugs.[9]  It was sunny outside and the vehicle, seen before at the residence, was

---

[4]*Michigan v. Summers*, 452 U.S. 692, 705 (1981).

[5]*See id.* at 693, 705.

[6]*See Los Angeles County v. Rettele*, 550 U.S. 609, 613-14 (2007); *Muehler v. Mena*, 544 U.S. 93, 98-99 (2005).

[7]*Summers*, 452 U.S. at 702-03.

[8]*See Martinez-Cortes*, 566 F.3d at 770; *see also United States v. Gill*, 290 Fed. Appx. 965, 967 (8th Cir. 2008) (reasonable to stop a person exiting a home about to be searched who might be a resident).

[9]*See Rettele*, 550 U.S. at 614; *Summers*, 452 U.S. at 702.

attempting to leave as Antman approached. The vehicle was close enough to the residence that those inside could see or hear what was going on and mount a defense. And had Antman and officers allowed the vehicle to drive away, they faced the risk that its occupants would use a cell phone and warn those in the house that a search was forthcoming and expose officers to increased peril. "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."[10]

These risks to officer safety were intensified when Bradshaw and Foster refused to stop the vehicle and show their hands as directed. Their actions gave Officer Antman reason to suspect, and probable cause to believe, that criminal activity was afoot. This justified him ordering Bradshaw and Foster out of the vehicle and detaining them for safety reasons, checking on driver license, vehicle registration, and outstanding warrants, and searching those parts of the vehicle where a weapon or contraband might be hidden.[11]

Bradshaw and Foster were involved in criminal activity and were trying to drive off. Officer Antman and assisting officers had every right to stop and detain the two and search them and their vehicle.

---

[10]*Summers*, 452 U.S. at 702-03.

[11]*See Martinez-Cortes*, 566 F.3d at 771; *see also United States v. Johnson*, 528 F.3d 575, 579 (8th Cir. 2008) (occupant of a home subject may be detained so as to prevent flight, minimize the risk of harm to officers, and allow officers to conduct an orderly search).

8

## B.    "Standing"

During the suppression hearing, the Court brought up whether Bradshaw had the right to challenge the search and seizure of evidence found on Foster and in the field he ran into.[12]  Bradshaw conceded that he had no such right over the property retrieved from Foster's person (cash and cell phones)[13] – and for good reason.[14]  But he urged that the black sock with the methamphetamine in it be suppressed based in he and Foster being charged as co-conspirators.[15]

The Supreme Court, however, has expressly rejected a co-conspirator exception to the "standing" rule.[16]  Because Bradshaw has failed to show that he had either a property interest in the field searched or a reasonable expectation of privacy in the sock and drugs seized, he has no basis to contest the introduction of such items at trial.[17]

---

[12]See Mot. Hrg. Tr. 6-9 (Aug. 28, 2018).

[13]See id. at 6, 9.

[14]See Rawlings v. Kentucky, 448 U.S. 98, 104-05 (1980); Rakas v. Illinois, 439 U.S. 128, 138-40, 148 (1978); Alderman v. United States, 394 U.S. 165, 173-74 (1969).

[15]See Mot. Hrg. Tr. 7.

[16]See United States v. Padilla, 508 U.S. 77, 81-82 (1993); see also United States v. Payne, 119 F.3d 637, 641 (8th Cir.) (there is no co-conspirator exception to the standing rule and defendant must show that he had a legitimate expectation of privacy for each search and the items seized during them), cert. denied, 522 U.S. 987 (1997).

[17]See Padilla, 508 U.S. at 82.

## C.    Probable Cause

Bradshaw next claims that the CI did not provide enough credible or reliable information to establish probable cause. He asserts that there was an insufficient showing made in the warrant affidavit to support issuing a warrant for the search of the places and items requested.

Before a search warrant may be issued, the Fourth Amendment requires a showing of probable cause.[18] "Probable cause" to search exists "if there is a fair probability that contraband or evidence of a crime will be found in a particular place."[19] In determining whether probable cause exists, a court must look at the totality of the circumstances.[20] This determination is to be "based upon a common-sense reading of the entire affidavit"[21] and any "reasonable inferences" drawn from it.[22] The assessment of probable cause is made "from the viewpoint of a reasonably prudent police officer acting in the circumstances of the [ ] case."[23] As the name itself suggests, "probable

---

[18]See United States v. Williams, 477 F.3d 554, 557 (8th Cir. 2007).

[19]Illinois v. Gates, 462 U.S. 213, 238 (1983).

[20]See id. at 230, 234.

[21]United States v. Seidel, 677 F.3d 334, 338 (8th Cir. 2012) (quoting United States v. Sumpter, 669 F.2d 1215, 1218 (8th Cir. 1982)).

[22]United States v. Wallace, 550 F.3d 729, 732 (8th Cir. 2008).

[23]Seidel, 677 F.3d at 337 (citing United States v. Reinholz, 245 F.3d 765, 776 (8th Cir.), cert. denied, 534 U.S. 896 (2001)).

cause is a practical, factual, and non-technical concept [that] deal[s] with probabilities" and should be applied with this in mind.[24]

A court's duty, when reviewing a warrant, is to ensure that the issuing judge had a "substantial basis for . . . conclud[ing] that [the] search would uncover evidence of wrongdoing."[25] "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants."[26]

In deciding whether the information from a CI is reliable, the Eighth Circuit has set forth various factors to consider. The appeals court, for example, has observed that there are indicia of reliability in "the richness and detail of a first-hand observation."[27] The court has also recognized that "statement[s] against the penal interest of an informant typically carry considerable weight" in establishing reliability.[28]    And

---

[24]*Seidel*, 677 F.3d at 337-38.

[25]*Gates*, 462 U.S. at 236 (*quoting Jones v. United States*, 362 U.S. 257, 271 (1960)).

[26]*United States v. Ventresca*, 380 U.S. 102, 109 (1965) (*citation omitted*).

[27]*United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009) (*quoting United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990)).

[28]*Buchanan*, 574 F.3d at 561-62 (*quoting United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001)).

according to the court, "[t]he circumstances of personal questioning may [likewise] enhance reliability and credibility."[29]

What's more, "[a]n informant may [ ] be considered reliable if the information he or she supplies 'is at least partially corroborated' by other sources."[30] "Even the corroboration of minor, innocent details can suffice to establish probable cause."[31]

Here, the CI's statements were based on "first-hand observations and knowledge rather than rumor or innuendo,"[32] and he provided information against his own penal interest.[33] Furthermore, Officer Antman, the warrant affiant, spoke with the CI directly and could personally assess his credibility.[34]

---

[29]*Buchanan*, 574 F.3d at 562; *see also United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994) (stating the reliability of a tip is enhanced when an agent meets personally with the informant to assess the latter's credibility), *cert. denied*, 514 U.S. 1090 (1995).

[30]*Buchanan*, 574 F.3d at 562 (*quoting United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir. 1992), *cert. denied*, 510 U.S. 814 (1993)); *see also United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993) ("If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable.").

[31]*Buchanan*, 574 F.3d at 562 (*quoting Tyler*, 238 F.3d at 1039).

[32]*Buchanan*, 574 F.3d at 562; *see also United States v. Oropesa*, 316 F.3d 762, 767 (8th Cir. 2003) (informant was working with detectives in an attempt to set up a controlled buy and had recently purchased drugs from defendant).

[33]*See United States v. Harris*, 403 U.S. 573, 583-84 (1971); *Buchanan*, 574 F.3d at 562.

[34]*See Buchanan*, 574 F.3d at 562; *Robertson*, 39 F.3d at 893.

The CI also provided specific and detailed information, independently corroborated by officers, that proved to be accurate. This included information about Foster and Bradshaw, their ethnicity, what state they came from, who they associated themselves with, where they stayed, the vehicle the traveled in, and the time and place of the controlled buy and the buy itself, including the exchange of almost half an ounce of methamphetamine for $600. The CI provided consistent information that showed Foster and Bradshaw were involved in the distribution of methamphetamine on the Rosebud Reservation and had enlisted the CI to assist them in that endeavor.

Giving due deference to the decision of the tribal judge, the Court finds that the CI's particularized information was reliable and sufficiently corroborated to furnish probable cause for issuing a warrant to search the Millard residence, the red Volkswagen parked in the driveway to it, and the curtilage surrounding the premises. The warrant affidavit was adequate enough to satisfy the probable cause strictures of the Fourth Amendment and to support officers' search for and seizure of drug related evidence.

## D. Nexus

Generally, there must be a nexus between the criminal activity, the things to be seized, and the places to be searched.[35] Bradshaw contends that the facts stated in

---

[35]*See generally* 2 Wayne R. LaFave, *Search & Seizure*, §3.7(d) (5th ed. 2012 & 2017-18 Supp.).

Officer Antman's warrant affidavit do not connect the property to be searched and the items to be seized. Bradshaw points out that none of the drug transactions the CI was privy to took place at the Millard residence or its curtilage.

Two days before Officer Antman prepared his affidavit, the CI bought 13.5 grams of presumptively positive methamphetamine from Foster for $600. Bradshaw drove Foster to and from the meeting place, where the hand-to-hand exchange occurred. The next night, Antman checked Millard's home on three separate occasions over a nine-hour period, and saw the red Volkswagen – the CI had described before – parked outside the home in the same location. This information alone, which Antman included in his sworn affidavit, provided the necessary linkage between the offenses being investigated (possession and distribution of methamphetamine) and the places to be searched (the residence, curtilage and Volkswagen) to find probable cause for issuing the search warrant.[36] Bradshaw's contentions otherwise are inefficacious.

### E. Particularity

Ever vigilant, Bradshaw complains that the search warrant was overbroad and violated the Fourth Amendment's particularity requirement. He says that the red

---

[36]*See United States v. Keele,* 589 F.3d 940, 943-44 (8th Cir. 2009); *United States v. El-Alamin,* 574 F.3d 915, 924 (8th Cir. 2009); *United States v. Martinez,* 78 F.3d 399, 401 (8th Cir. 1996).

Volkswagen, officers searched and seized evidence from, "was not even specifically described in the warrant."[37]

The Fourth Amendment's Warrant Clause categorically prohibits issuing a warrant unless it "particularly describe[s] the place to be searched, and the persons or things to be seized."[38] The purpose of the particularity requirement is to prevent general searches. "By limiting the authorization to search the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."[39]

A search warrant is proper if its description of the evidence to be seized is "'sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized.'"[40] The requisite degree of specificity is flexible, depending on the circumstances.[41] Thus, a description is generally valid "if it is as specific as the circumstances and nature of the activity under

---

[37]Dkt. No. 97 (Mem. in Supp. of Mot. to Suppress at 12) (Aug. 9, 2018)).

[38]U.S. Const. amend. IV.

[39]*Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

[40]*United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988) (*quoting United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir. 1978)).

[41]*See United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986).

investigation permit."[42]  The standard to be used in making this determination is one of "practical accuracy rather than a hyper-technical one."[43]  A court must "base its decision on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the totality of the circumstances surrounding the case."[44]

Applying these standards here, the Court is not convinced that the search warrant lacked particularity.  The warrant described both the places to be searched and the things to be seized with enough detail to pass constitutional muster.  The searches were confined to the Millard residence, vehicles beside it, and the surrounding curtilage and hence, were limited to a specific area – one executing officers were familiar with. The warrant amply circumscribed the authority of where officers could search and what they could seize.

Granted, the Volkswagen – although covered generically as a "vehicle" in the search warrant – was not named or particularly described in the warrant.  But this omission is not fatal and does not invalidate the warrant.[45]  Officers found the Volkswagen on the premises and the vehicle had either been given or lent to an

---

[42]*Id.*

[43]*United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011), *cert. denied*, 565 U.S. 1246 (2012).

[44]*Id.*

[45]*See United States v. Sturgis*, 652 F.3d 842, 844 (8th Cir. 2011), *cert. denied*, 566 U.S. 950 (2012); *United States v. Johnson*, 640 F.3d 843, 845-46 (8th Cir. 2011); *United States v. Bulgatz*, 693 F.2d 728, 730, n. 3 (8th Cir. 1982), *cert. denied*, 459 U.S. 1210 (1983).

occupant who resided in the home to be searched.[46]    Officer Antman specifically referred to the vehicle in his affidavit.    And he stated that Bradshaw and Foster had used the vehicle to transport methamphetamine and to facilitate transactions involving the purchase and sale of the drug.    This information was ample enough to bring the Volkswagen within the scope of the warrant authorizing the search of the Millard premises.[47]

The search warrant in question was not overbroad.    A practical, rather than pedantic, reading of the warrant told officers where and what to search for.    In the final analysis, the warrant's description of the places to be searched and the items to be seized was sufficiently particularized to satisfy the prescriptions of the Fourth Amendment.    Suppression of the evidence seized from the Volkswagen, on particularity grounds, would be a mistake.

**F.  Misstatements and Material Omissions**

Bradshaw further argues that Officer Antman omitted material facts and made a false statement in his search warrant affidavit that affected the tribal judge's probable cause decision.    He maintains that Antman should have disclosed the nature and extent of the CI's deferred prosecution agreement (including the terms of it) and the benefits the CI received.    Bradshaw also asserts that Antman failed to disclose the CI's

---

[46]*See* Mot. Hrg. Tr. 4-5.

[47]*See United States v. Pennington*, 287 F.3d 739, 745 (8th Cir. 2002), *cert. denied*, 537 U.S. 1022 (2002).

inconsistent statements about who Foster arrived and had been with, saying the person was "Mike" in one report and "Chris" in the warrant affidavit. Citing *Franks v. Delaware*,[48] he alleges that Antman's omissions and misstatement were intentional or at least recklessly made and that he is entitled to an order voiding the search warrant and suppressing all evidence seized under it.

Where the probable cause finding is premised on an affidavit containing omitted or false statements, the resulting search warrant may be invalid if the defendant can establish, by a preponderance of the evidence, that (1) the affiant intentionally, or with reckless disregard for the truth, omitted facts or included a false statement in the warrant affidavit, and (2) without the omissions or false statements, the affidavit would not have established probable cause.[49] Allegations of negligence or innocent mistake will not suffice to establish deliberate or reckless falsehood.[50]

Officer Antman disclosed, in his affidavit, that the CI was "cooperating with the Rosebud Sioux Tribe Drug Task [Force] through a Deferred Prosecution Agreement."[51] By doing so, Antman made it known that the CI was subject to a drug prosecution and

---

[48]438 U.S. 154 (1978).

[49]*See Franks*, 438 U.S. at 155-56; *United States v. Neal*, 528 F.3d 1069, 1072 (8th Cir. 2008).

[50]*See Franks*, 438 U.S. at 171; *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir.), *cert. denied*, 554 U.S. 908 (2008).

[51]Dkt. No. 97 at Ex. 1, ¶4 (Aff. in Supp. of Req. for Search Warr.) (April 27, 2017).

had entered into an agreement that required him to cooperate with the Tribe's drug task force. And Antman's affidavit spelled out what the CI had done by way of cooperation. This information was important for the reviewing court to assess the CI's reliability and did not rise to the level of (or even come close to) an actionable omission under *Franks*.

Contrary to Bradshaw's assertions, Officer Antman did not omit or misstate anything in the warrant affidavit about the CI conveying that it was "Mike," and not "Chris," who had driven up with Foster from Arizona and was selling methamphetamine on the Rosebud Reservation (or at least helping Foster do so). The reference to "Mike" is in a separate report Antman prepared[52] not attached to his affidavit.[53] This reference does not appear anywhere in the four corners of the affidavit.[54] Everything Antman said in the affidavit – including the CI's statements that it was "Chris" (identified later on as Bradshaw) who was with Foster and driving the Volkswagen – was true. Antman acknowledged the error he made in his report and testified – credibly – that it was inadvertent and not what he meant to say.[55] Antman simply mixed up the names ("Mike" and "Chris") one time. This single lapse was

---

[52]*See* Docket No. 97, Ex. 2 (Antman's Controlled-Buy R.).

[53]*See* Mot. Hrg. Ex. 20 (Aug. 28, 2018).

[54]*See* Mot. Hrg. Tr. 113.

[55]*See id.* at 85-87.

neither intentional nor reckless and does not require further inquiry – much less relief – under *Franks*.

## G. Tainted Fruit

Bradshaw lastly claims that any evidence derived from the tribal warrant was the tainted fruit of an illegal search and seizure and must be suppressed under the Exclusionary Rule.[56] His claim is unavailing.

The Court has already determined that the April 27 warrant, and the search and seizure of evidence conducted in accordance with it, did not violate the Fourth Amendment. This being the case, there is no "poisonous tree" from which any tainted fruit could grow or fall from.

## H. Good Faith

Regardless of whether the warrant comported with the mandates of the Fourth Amendment, the places searched and the evidence seized must nevertheless be upheld. The basis for doing so is the "good faith" exception to the warrant requirement announced in *United States v. Leon*.[57]

In *Leon*, the Supreme Court created an exception to the Fourth Amendment Exclusionary Rule.[58] Under this exception, the Rule is not to "be applied to exclude the

---

[56]*See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

[57]468 U.S. 897 (1984).

[58]*See id*. at 922.

use of evidence obtained by [ ] officers acting in reasonable reliance on the detached and neutral [ ] judge's determination of probable cause and the issuance of a search warrant that is ultimately found to be invalid."[59]

The rationale behind the exception is straight forward. It is the judge's responsibility to determine whether probable cause exists and if so, to issue a warrant that complies with the dictates of the Fourth Amendment. Ordinarily, an officer cannot be expected to question or second guess the judge's probable-cause determination or the technical sufficiency of the warrant itself. "[O]nce the warrant issues, there is literally nothing more the [officer] can do in seeking to comply with the law."[60] Penalizing the officer for the judge's errors, rather than the officer's own, does not deter Fourth Amendment violations.[61]

The *Leon* exception does not exclude evidence when an officer's reliance on a judge-issued warrant is objectively reasonable.[62] But if the judge issuing the warrant is misled by information in an affidavit that the affiant knows is false or is made with

---

[59]*United States v. Taylor*, 119 F.3d 625, 629 (8th Cir.) (*citing Leon*, 468 U.S. at 905), *cert. denied*, 522 U.S. 962 (1997); *see also United States v. Gipp*, 147 F.3d 680, 688 (8th Cir. 1998) (applying *Leon's* good-faith exception to a tribal search warrant).

[60]*Leon*, 468 U.S. at 921.

[61]*See id.*

[62]*See id.*at 922-23; *see also Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984) (where police officers took every step that could reasonably be expected of them and there was an objectively reasonable basis for their mistaken belief that the warrant authorized the search they conducted).

reckless disregard for the truth, then suppression remains an appropriate remedy.[63] The exception also does not apply when the issuing judge totally abandons his judicial role because when this occurs, no reasonable well-trained officer should rely on the warrant.[64]  And an officer cannot manifest objective good faith in relying on a warrant when the supporting affidavit is "so lacking in indicia of probable cause as to render official belief in [the warrant's] existence entirely unreasonable."[65]  Finally, depending on the circumstances of the case, a warrant may be facially deficient – because, for example, it failed to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.[66]

None of these disqualifying condition precedents exist here.  The search warrant affidavit contained no knowing, intentional, or reckless omissions or false statements.[67] Additionally, there is no evidence that the tribal judge failed to act in a neutral and detached manner or that he was a mere "rubber stamp" or an "adjunct law enforcement

---

[63]See Leon, 468 U.S. at 923.

[64]See id.

[65]Id.

[66]See id.; Sheppard, 468 U.S. at 988-91.

[67]See United States v. Cannon, 703 F.3d 407, 414-15 (8th Cir.), cert. denied, 569 U.S. 987 (2013); United States v. Chambers, 987 F.2d 1331, 1334 (8th Cir. 1993); United States v. Long, 30 F.Supp.3d 835, 856 (D.S.D. 2014), aff'd 797 F.3d 558 (8th Cir. 2015)); see also United States v. Medearis, 775 F.Supp.2d 1110, 1122 (D.S.D. 2011) (none of the agent's statements contained known or reckless falsities and none of the information he supplied to the warrant issuing judge was inaccurate).

officer."[68] Nor is there evidence to suggest that the judge was somehow involved in the "competitive enterprise of ferreting out of crime"[69] or that he "blindly" approved the search warrant."[70]

Beyond this, the affidavit in support of the search warrant, was neither devoid of nor lacking in probable cause and thus could reasonably be relied on as a basis for issuing a valid warrant to search the Millard residence, the curtilage around it, and the red Volkswagen Foster and Bradshaw were in.[71] In the end, the tribal judge did not adopt a request – made by an informant-grounded affidavit – that was bereft of probable cause, perfunctory, or "bare bones."[72]

---

[68]See Long, 797 F.3d at 566-67; United States v. Farlee, 757 F.3d 810, 819-20 (8th Cir.), cert. denied, 135 S.Ct. 504 (2014); see also United States v. Waln, No. 3:17-CR-30004(01), (02), (04)-RAL, 2017 WL 6033041 at *5 (D.S.D. Dec. 5, 2017) (tribal judge did not abandon his judicial role and act as a "rubber stamp" for police).

[69]Johnson v. United States, 333 U.S. 10, 14 (1948).

[70]United States v. LaBatte, No. CR. 12-30158-RAL, 2013 WL 2286340 at *6 (D.S.D. May 23, 2013); United States v. Valandra, No. CR. 11-30010-RAL, 2011 WL 3439919 at *4 (D.S.D. Aug. 5, 2011).

[71]See Farlee, 757 F.3d at 819; United States v. Patten, 664 F.3d 247, 250-51 (8th Cir. 2011), cert. denied, 566 U.S. 969 (2012); see also United States v. Carpenter, 341 F.3d 666, 670-73 (8th Cir. 2003)

[72]See Leon, 468 U.S. at 915, 926; United States v. Koons, 300 F.3d 985, 991 (8th Cir. 2002).

Lastly, the search warrant was not so facially deficient that no officer could reasonably presume it to be invalid.[73] The warrant described – with sufficient particularity – the places to be searched and the items to be seized so that executing officers could reasonably assume the warrant was enforceable.[74] Under the circumstances, Officer Antman could have reasonably believed that there was a constitutionally sufficient nexus between the property on the Millard homesite and the suspected drugs.[75] And it was reasonable for Antman to believe (given what he knew, was told, and saw) that there would be contraband in the home, vehicles parked beside it, and the surrounding curtilage.[76] Given the common sense appeal of such an inference, and its acceptance by the tribal judge, Antman cannot be faulted for viewing the inference – and the warrant on which it was based – to be permissible.[77]

The search warrant, Bradshaw assails, is not unlike others that have been before the Court in the recent past. In those cases, the *Leon* exception was applied.[78] The Court

---

[73]See *Long*, 797 F.3d at 568; *Carpenter*, 341 F.3d at 673.

[74]See *Valandra*, 2011 WL 3439919 at **8-9.

[75]See *Carpenter*, 341 F.3d at 671.

[76]See *id*.

[77]See *Carpenter*, 341 F.3d at 671-72 & n. 3.

[78]See e.g. *United States v. Whitney*, No. 3:17-CR-300114-RAL, order (D.S.D. Jan. 31, 2018) (adopting report and recommendation and relying on *Leon* to deny suppression of search warrants); *Waln*, 2017 WL 6033041 at **3-5 (applying the good-faith exception and upholding a tribal search warrant of defendants' residence in the face of probable. . .)

(continued. . .)

sees no reason why the exception should not be applied here (if, of course, the warrant is adjudged to be inoperative).

Officer Antman's reliance on the search warrant was in good faith and objectively reasonable. Antman rightfully believed he had a valid warrant, or at least court-approved authority to search for and seize evidence from the red Volkswagen, residence and the curtilage to it. A reasonably well-trained officer in his position would not have known that the searches and seizures were illegal when the issuing judge sanctioned them after finding probable cause had been shown.[79]

Persuaded that *Leon* and the good-faith exception apply to the search warrant at issue, the Court concludes that the evidence obtained from the Millard homeplace and curtilage of it (including the red Volkswagen) should not be suppressed. If the Eighth Circuit and other courts from this District would probably find the warrant valid, then it is difficult to say that Officer Antman's conduct in executing the warrant was objectively unreasonable. If there were any errors, they were the tribal judge's doing, not Antman's.

---

cause challenges); *LaBatte*, 2013 WL 2286340 at **4-6 (despite shortcomings in search warrant application as to probable cause, evidence not suppressed because of good-faith exception); *Valandra*, 2011 WL 3439919 at **3-8 (applying *Leon* even though deficiencies in application and issuance of tribal search warrant); *Medearis*, 775 F.Supp.2d at 1122-24 (officers' reliance on tribal judge's search warrant was objectively reasonable and thus subject to good-faith exception).

[79]*See Leon*, 468 U.S. at 922, n. 23; *United States v. Moya*, 690 F.3d 944, 948-49 (8th Cir. 2012).

Invoking the Exclusionary Rule in Bradshaw's case would serve no useful deterrent purpose because the rare occasion when a judge makes an inadvertent mistake cannot be eliminated by suppressing the evidence in that situation.[80] The judge is the final reviewing official who "must shoulder the ultimate responsibility for [ ] error in [the] warrant application process."[81] Officer Antman should not be expected to question the judgment of a judicial officer as to the technical sufficiency of a warrant and the probable cause necessary to support issuing one.[82]

Remember that the Constitution protects individuals not by giving them a license to engage the police in a debate over the propriety of a warrant, but by interposing the impartial judgment of a judicial officer between themselves and the police and by providing a right to suppress evidence improperly obtained. Bradshaw received the benefit of a judge's independent evaluation before tribal officers conducted their searches. The searches were supported by enough probable cause to make them arguably sufficient. Suppression of the evidence officers seized would be a remedy out of proportion to any Fourth Amendment transgression that may have taken place and is uncalled for in this instance.[83]

---

[80]*See Leon,* 468 U.S. at 918-21, 926.

[81]*United States v. Berry,* 113 F.3d 121, 124 (8th Cir. 1997).

[82]*See Leon,* 468 U.S. at 921; *Valandra,* 2011 WL 3439919 at **5-6.

[83]*See Leon,* 468 U.S. at 918-21, 926.

## CONCLUSION

Bradshaw's stop and detention, while with Foster in the red Volkswagen and after fleeing, was lawful. Bradshaw lacks standing to challenge (1) the search of Foster's person and field next to Millard's house and (2) the seizure of the items found in both places. But even if he has standing to contest all the evidence officers impounded, there was probable cause for the search and seizure of the drug related items confiscated from the field, house and Volkswagen. A clear nexus existed between the suspected offenses and the places searched. The information supplied for issuing the search warrant came from a credible source and was reliable. The warrant was not overbroad but particular enough in its descriptions. The affidavit submitted to the warrant judge was completely factual and contained no omissions of any consequence. And no basis exists to exclude any of the evidence derived from the warrant as "tainted fruit" under the Exclusionary Rule.

At any rate, the searches and seizures conducted were based on an objectively reasonable (good faith) belief that the warrant, a judge found probable cause to issue, was valid. Either way, the law – when applied to the facts here – thwarts, or at least stymies, Bradshaw's ability to prevail on his suppression motion.

## RECOMMENDATION

For all of these reasons, and based on the authorities cited in this Report, it is hereby

RECOMMENDED that Bradshaw's Motion to Suppress[84] be denied.

## NOTICE

By agreement, the parties have *three* calendar days after services of this Report and Recommendation to file their objections to the same.[85] Unless an extension of time for cause is later obtained,[86] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[87]  Objections must "identify[] those issues on which further review is desired[.]"[88]

DATED this ___ day of September, 2018, at Pierre, South Dakota.

**BY THE COURT:**

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

---

[84]*See* Dkt. No. 96.

[85]*See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[86]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black,* 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[87]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[88]*Arn*, 474 U.S. at 155.

28